UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ABU ZAFAR, an individual,

Plaintiff,

v

Case No. 1:15-cv-0361

ABBOTT LABORATORIES, INC.,
a corporation,

HON. GORDON J. QUIST

Defendant.

Jon E. Klinghoffer (IL Bar No. 6270082)
Kristen A. Jones (IL Bar No. 6300135)
**Attorneys for Defendant**
GOLDBERG KOHN LTD.
55 East Monroe Street
Suite 3300
Chicago, Illinois 60603
(312) 201-4000
jon.klinghoffer@goldbergkohn.com
kristen.jones@goldbergkohn.com

Keith E. Eastland (P66392)
Sarah K. Willey (P57376)
MILLER JOHNSON
**Attorneys for Defendant**
250 Monroe Avenue, NW, Suite 800
Grand Rapids, MI 49503
(616) 831-1700
eastlandk@millerjohnson.com
100 West Michigan Avenue, Suite 200
Kalamazoo, MI 49007
(269) 226-2950
willeys@millerjohnson.com

**ABBOTT LABORATORIES' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

I. INTRODUCTION .......... 1
II. STATEMENT OF MATERIAL FACTS.......... 1
A. Zafar's Employment At Abbott.......... 1
1. Abbott's Prophylactic Measures .......... 2
2. Zafar's Job Responsibilities and Training.......... 3
3. Zafar's Team Leader and Management.......... 5
B. Zafar's Performance Issues. .......... 5
C. The August 6 Incident and Zafar's Termination. .......... 7
1. The August 6 Incident.......... 7
2. Abbott's Investigation into Zafar's Conduct .......... 9
3. Abbott's Termination Decision-Making .......... 10
D. Zafar's Allegations. .......... 11
1. Allegations Supporting Zafar's Claim of Race and National Origin Discrimination .......... 11
2. Allegations Supporting Zafar's Claim of Age Discrimination .......... 13
III. LEGAL ANALYSIS.......... 13
A. Zafar's Race, National Origin and Age Discrimination Claims Fail As A Matter of Law. .......... 13
1. Zafar Was Not Qualified for the Position, Because He Was Not Performing His Job To Abbott's Legitimate Expectations .......... 15
2. Zafar Cannot Show That Abbott Took Steps to Replace Him with a Person Outside the Class .......... 16
3. Zafar Cannot Show That Any Similarly Situated Employees Were Treated Differently Than Him .......... 17
4. Zafar Cannot Show That Abbott's Legitimate, Non-Discriminatory Reason For His Termination Was Pretextual .......... 18
IV. CONCLUSION.......... 22

# INDEX OF AUTHORITIES

Page(s)

**Cases**

*Bowie v. Advanced Ceramics Corp.*,
72 F. App'x 258 (6th Cir. 2003) ........ 15

*Chen v. Dow Chem. Co.*,
580 F.3d 394 (6th Cir. 2009) ........ 14, 18, 21

*Hedrick v. W. Reserve Care Sys.*,
355 F.3d 444 (6th Cir. 2004) ........ 20, 22

*Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*,
176 F.3d 921 (6th Cir. 1999) ........ 15, 16, 17

*Majewski v. Automatic Data Processing, Inc.*,
274 F.3d 1106 (6th Cir. 2001) ........ 20, 21

*Marotta v. Ford Motor Co.*,
No. 14-CV-11149, 2015 WL 4756523 (E.D. Mich. Aug. 11, 2015) ........ 17

*Marotta v. Ford Motor Co.*,
No. 14-CV-11149, 2015 WL 5336202 (E.D. Mich. Sept. 14, 2015) ........ 17

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973) ........ 14

*Mills v. Phila. Gas Works*,
No. 06-2444, 2007 WL 2071881 (E.D. Pa. July 19, 2007) ........ 16

*Mitchell v. Toledo Hosp.*,
964 F.2d 577 (6th Cir. 1992) ........ 14, 15, 16, 17

*Newman v. Fed. Express Corp.*,
266 F.3d 401 (6th Cir. 2001) ........ 14

*Phelps v. Yale Sec., Inc.*,
986 F.2d 1020 (6th Cir. 1993) ........ 19

*Simpson v. Midland-Ross Corp.*,
823 F.2d 937 (6th Cir. 1987) ........ 14

*Strickland v. Fed. Express Corp.*,
45 F. App'x. 421 (6th Cir. 2002) ........ 19

*Trans World Airlines, Inc. v. Hardison*,
432 U.S. 63 (1977) ........ 16

**Statutes**

42 U.S.C. § 2000 e-2 ........ 16

## I. INTRODUCTION

Plaintiff Abu Zafar ("Zafar") is a former chemist who worked in the Analytical Laboratory at Abbott Laboratories' ("Abbott's") Sturgis facility. Zafar was terminated after drinking a can of product that was sent to the Analytical Laboratory for testing. His decision to drink the can of product demonstrated poor judgment and put both his own safety and the safety of Abbott's customers at risk. This conduct, when coupled with Zafar's then on-going performance issues, resulted in Zafar's termination.

In response to his termination, Zafar has filed a two-count complaint against Abbott alleging race, national origin and age discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 1981, the Age Discrimination in Employment Act, and the Michigan Elliott-Larsen Civil Rights Act. Each of these claims fails as a matter of law. Zafar cannot state a *prima facie* case of discrimination, and even if he could, he cannot show that Abbott's legitimate, non-discriminatory reason for his termination was pretext for discrimination. For all of these reasons, the Court should grant Abbott's Motion for Summary Judgment.

## II. STATEMENT OF MATERIAL FACTS

### A. Zafar's Employment At Abbott.

Abbott Laboratories is a global, broad-based health care company devoted to discovering new medications, new technologies, and new ways to manage health. (**Exhibit 1**, Affidavit of Deanna Denton ("Denton Aff.") at ¶¶ 1-2[1]). Abbott Nutrition is a division of Abbott that focuses on innovative nutrition products that help babies and children grow, work to keep bodies strong, and support the unique needs of patients with chronic illnesses. (Denton Aff. at ¶¶ 1, 3). Abbott hired Zafar on June 2, 1997 as an at-will Associate Chemist I working out of its

[1] The affidavit of Deanna Denton is cited as "Denton Aff." A copy of the Denton Affidavit and exhibits in support thereof are attached as **Exhibit 1**.

Abbott Nutrition Sturgis facility's Analytical Laboratory. (**Exhibit 2**, Deposition of Abu Zafar ("Pl. Dep.") 22:11-13, 23:12-24:12, 25:5-9, 73:13-15[2]; **Exhibit 3**, Pl. Dep. Ex. 3[3]; **Exhibit 4**, Affidavit of Amy Frost ("Frost Aff.") at ¶ 23[4]). The Sturgis facility manufactures and packages liquid nutritional products, including infant formula and Ensure©. (**Exhibit 5**, Deposition of Michael James ("James Dep.") 10:6-11:8[5]; Denton Aff. at ¶¶ 1, 4).

Beginning in May 2001, Zafar worked in the Sturgis facility's Analytical Laboratory as an Assistant Chemist II, which is the position he held at the time of his termination. (Pl. Dep. 26:16-21; Frost Aff. ¶¶ 23-24). The chemists in the Analytical Laboratory worked in three shifts. (Pl. Dep. 73:18-20). At the time of his termination, Zafar worked on the first shift. (Pl. Dep. 73:16-17).

*1. Abbott's Prophylactic Measures*

At all relevant times, Abbott had in place a Workplace Harassment Policy that prohibited harassment and discrimination on the basis of, among other things, race, national origin and age. (Pl. Dep. 33:19-34:3; Pl. Dep. Ex. 6; Frost Aff. ¶¶ 4, 7-8). Zafar was aware of the Workplace Harassment Policy and reviewed it on an annual basis. (Pl. Dep. 33:19-34:3; Pl. Dep. Ex. 6). At all relevant times, Abbott also had in place an Equal Employment Opportunity Policy, with which Zafar was familiar. (Pl. Dep. Ex. 5; Pl. Dep. 32:14-33:11; Frost Aff. at ¶¶ 4, 7).

In addition, Abbott maintained a Code of Business Conduct (the "Code"), which is a collection of ethical rules governing all Abbott employees' conduct. (Pl. Dep. Ex. 7; Pl. Dep.

[2] The deposition of Abu Zafar was taken on July 14, 2015 and is cited as "Pl. Dep." Copies of the relevant excerpts from the Zafar deposition are attached as **Exhibit 2**.
[3] The exhibits from the Zafar deposition are cited as "Pl. Dep. Ex." Copies of the cited exhibits from the Zafar deposition are attached as **Exhibit 3**.
[4] The affidavit of Amy Frost is cited as "Frost Aff." A copy of the Frost Affidavit and exhibits in support thereof are attached as **Exhibit 4**.
[5] The deposition of Michael James was taken on October 19, 2015 and is cited as "James Dep." Copies of the relevant excerpts from the James deposition are attached as **Exhibit 5**.

34:10-35:2; Frost Aff. at ¶¶ 4-6). The Code existed to ensure compliance with applicable policies and laws. (Pl. Dep. Ex. 7; Pl. Dep. 34:10-35:2; Frost Aff. at ¶¶ 4-5). Zafar was required to certify that he read and reviewed the Code on an annual basis. (Pl. Dep. 34:4-20; Frost Aff. at ¶¶4, 6). Abbott's Code set forth several principles, including Principle 9 (Compliance with Abbott Standards, Policies and Procedures), with which Zafar was familiar and understood that he needed to comply. (Pl. Dep. 34:10-35:2; Pl. Dep. Ex. 7). Abbott's Code further established Abbott's "policy to provide employment opportunities without regard to race, […] national origin, […] age […] or any other reason prohibited by law." (Pl. Dep. 35:3-16; Pl. Dep. Ex. 7).

*2. Zafar's Job Responsibilities and Training*

In his role as Assistant Chemist II, Zafar was responsible for performing analytical tests on raw ingredients, in-process product, and finished product brought to the Analytical Laboratory for testing. (Pl. Dep. 26:23-27:14; Denton Aff. at ¶ 7, Ex. A). Chemists in the Analytical Laboratory performed both routine testing and testing due to specific concerns relating to a product or ingredient. (Denton Aff. at ¶ 7). The types of testing performed included assessments of a product's or ingredient's vitamins; minerals; fats; proteins; stability, including flavor, aroma or pH levels; and density, moisture or sediment in powders. (Pl. Dep. 46:19-48:10). The chemists were responsible for conducting the testing in accordance with detailed written procedures and specifications in order to ensure that Abbott's quality standards were met. (Pl. Dep. 27:11-14, 39:15-24; Denton Aff. at ¶ 7, Ex. A). As a chemist, Zafar received annual training on Abbott's Flavor Testing Standard Operating Procedure ("SOP") and related Laboratory Method. (Pl. Dep. 38:9-39:24, 43:15-44:23; Denton Aff. at ¶¶ 8-11, Exs. B-D; Frost Aff. at ¶¶ 9-10, Ex. A; James Dep. 30:21-31:9; Denton Dep. 114:8-25; **Exhibit 6**, Deposition of

Thomas Darrington ("Darrington Dep.") 37:1-39:1[6]). The Flavor Testing SOP and Laboratory Method required, among other things, that at least two people participate in each flavor evaluation, the chemists only take two sips of the product to perform the flavor analysis, and that the chemists record the data from the testing. (**Exhibit 7**, Deposition of Deanna Denton ("Denton Dep.") 113:1-114:25[7]; Denton Aff. at ¶¶ 9-11, Exs. B-D; Pl. Dep. 44:24-46:6, James Dep. 30:21-31:9).

The Sturgis facility also had in place procedures to protect the integrity of the product and to ensure the safety of employees. (Darrington Dep. 160:19-162:18; Denton Dep. 33:16-25; Denton Aff. at ¶ 8). For instance, SOP-ST-1000.08, Dress Code and Personal Hygiene, provided that:

> Food, beverage, candy, chewing gum . . . or other similar items will not be consumed, used, carried or stored in manufacturing, processing . . . laboratory or locker room areas.

(Denton Aff. at ¶¶ 8, 12, Ex. E). Zafar, and all other chemists, received annual training on the Dress Code and Personal Hygiene SOP. (Denton Dep. 117:20-24; Darrington Dep. 160:19-162:18; Denton Aff. at ¶ 8; Frost Aff. at ¶¶ 9-10, Ex. A). In addition, Abbott Nutrition's Good Manufacturing Statement of Expectations, which Zafar certified that he read and reviewed on an annual basis, provided that Zafar agreed to:

- Abide by all applicable policies and procedures for which I am required to know, based upon my job responsibilities.
- Understand the requirements of procedures given or training provided.
- Follow the dress code, personal hygiene practices and established housekeeping requirements while in the facility to the extent necessary to protect against product contamination.

---

[6] The deposition of Thomas Darrington was taken on October 20, 2015 and is cited as "Darrington Dep." Copies of the relevant excerpts from the Darrington deposition are attached as **Exhibit 6**.

[7] The deposition of Deanna Denton was taken on September 25, 2015 and is cited as "Denton Dep." Copies of the relevant excerpts from the Denton deposition are attached as **Exhibit 7**.

(Denton Aff. at ¶¶ 8, 13, Ex. F; Frost Aff. at ¶¶ 9, 11, Ex. B). Zafar was trained on Abbott Nutrition's Good Manufacturing Practices. (Frost Aff. at ¶¶ 9, 11-12, Exs. B, C; Denton Dep. 117:20-24).

*3. Zafar's Team Leader and Management*

In 2014, each shift of chemists in the Analytical Laboratory had assigned team leaders and a supervisor. (Pl. Dep. 159:2-7; James Dep. 11:13-12:19, 16:22-19:4; Denton Dep. 23:24-24:21, 25:25-26:4; Darrington Dep. 31:17-32:7). One of Zafar's Team Leaders was Michael James ("James") (Pl. Dep. 28:2-3, 88:1-10; James Dep. 30:3-5). Deanna Denton ("Denton") was the Analytical Laboratory First Shift Supervisor from April 2012 through May 2015. (Denton Dep. 9:4-10:6, 22:20-23:4). Denton's supervisor was Thomas Darrington ("Darrington"), who became the Analytical Laboratory Manager in July 2001. (Darrington Dep. 132:18-20). At the time of Zafar's termination, Denton was Zafar's supervisor and Darrington was Zafar's manager. (Pl. Dep. 32:4-9).

**B. Zafar's Performance Issues.**

In 2010, Zafar's then-supervisor, James Nelson ("Nelson"), noted in Zafar's annual performance review that "[he] would also like to see [Zafar] continue to consistently focus on leaving his area clean, organized, and caught up before the next shift." (Pl. Dep. 49:21-50:2; Pl. Dep. Ex 11). Nelson observed further performance issues in 2011, including receiving complaints about Zafar from chemists who followed him on second shift. (Pl. Dep. 50:25-51:3; Pl. Dep. Ex. 12). Specifically, Nelson noted:

> Abu will be more successful if he anticipates the needs of others in the group and prioritizes based on that. Also, I have talked to Abu about getting help if needed to avoid falling behind and leaving too much work for the next shift.

(Pl. Dep. Ex. 12). As a result, Nelson rated Zafar as "Partially Achieved" on his annual performance review in the core competency category of "Adaptability." The "Partially

Achieved" rating is the second lowest of four possible ratings: (1) Not Achieved; (2) Partially Achieved; (3) Achieved Expectations; and (4) Exceeds Expectations. (Pl. Dep. Ex. 12; Pl. Dep. 50:6-24).

During her first year as Zafar's supervisor, Denton observed similar performance issues and received the same complaints from second shift chemists regarding Zafar's performance. (Pl. Dep. 51:7-13; Pl. Dep. Ex. 13). Denton wrote the following in Zafar's 2012 performance review:

> Abu was inconsistent in his performance and prioritizing. I received complaints from following shift personnel at times. Abu will be more successful if he anticipates the needs of others in the group and prioritizes accordingly.

Consequently, Denton gave Zafar a "Partially Achieved" rating ("PA") in the core competency category of "Adaptability" for a second year in a row. (Pl. Dep. 51:7-13; Pl. Dep. Ex. 13). Denton also rated Zafar as "PA" in the core competency category of "Adherence to Good Manufacturing Practices," noting:

> Abu has been reminded that he needs to follow work order specifications. This has led to untimely delivery of results on some occasions. On several occasions, his failure to follow workorder [sic] specifications has led to late retesting of samples that have held up releases.

(Pl. Dep. Ex. 13).

The next year, Denton gave Zafar an overall "PA" rating on his 2013 annual performance review. (Pl. Dep. 51:14-20; Pl. Dep. Ex. 14). Denton believed Zafar continued to exhibit performance deficiencies, including a failure to prioritize business needs, failure to organize his time to complete the work in an efficient or timely manner, failure to follow through on projects and independently troubleshoot issues, and a lack of knowledge regarding the instruments that his job necessitated that he use and understand. (Pl. Dep. 51:14-20; Pl. Dep. Ex.

14; Denton Dep. 98:11-100:18, 104:22-108:23, 116:12-22; (**Exhibit 8**, Denton Dep. Ex. 11[8]; James Dep. 19:2-20:5, 56:11-57:1; Denton Aff. at ¶ 15).

Denton further concluded that Zafar's performance for 2014 was trending towards an overall "PA" rating due to the same continued performance deficiencies. (Denton Aff. ¶ 16; Darrington Dep. 46:14-47:5; James Dep. 19:2-20:5, 56:11-57:1).

### C. The August 6 Incident and Zafar's Termination.

#### *1. The August 6 Incident*

It came to Abbott's attention that a batch of Ensure© nutritional drink was out of specification during the sterilization process. (Denton Dep. 31:25-32:6; **Exhibit 9**, Deposition of Amy Frost ("Frost Dep.") 56:8-57:1, 58:5-21, 59:14-60:6[9]; **Exhibit 10**, Frost Dep. Exs. 8, 11, 12[10]). Due to concerns about the product's stability, a 24-can case of the Ensure© was requisitioned and brought to the Analytical Laboratory for testing. (Denton Dep. 29:20-30:1; Frost Dep. Exs. 8, 11, 12). To obtain a statistical sampling of the batch, the Quality Assurance team required that each of the 24 cans in the case be inspected for bulges and the contents tested to determine the physical stability of the product. (Denton Dep. 29:20-30:4; Frost Dep. Exs. 11, 12; James Dep. 29:17-30:2). The required testing on that case of Ensure© did not include Flavor Testing. (Denton Dep. 30:12-15; Frost Dep. 67:17-69:23, 79:8-80:23; Frost Dep. Ex. 18).

On August 6, 2014, Denton walked into the Analytical Laboratory and noticed that what she presumed to be the aforementioned 24-can case of Ensure© had been ripped open and a can was missing. (Denton Dep. 27:6-28:22; Frost Dep. Ex. 8; **Exhibit 11** Deposition of

---

[8] The exhibits from the Denton deposition are cited as "Denton Dep. Ex." Copies of the cited exhibits from the Denton deposition are attached as **Exhibit 8**.

[9] The deposition of Amy Frost was taken on September 16, 2015 and is cited as "Frost Dep." Copies of the relevant excerpts from the Frost deposition are attached as **Exhibit 9**.

[10] The exhibits from the Frost deposition are cited as "Frost Dep. Ex." Copies of the cited exhibits from the Frost deposition are attached as **Exhibit 10**.

Peter Carney ("Carney Dep.") 25:13-26:12[11]). When Denton asked chemist Peter Carney ("Carney") what happened to the missing can, he told her that Zafar drank the can of Ensure© because "he was thirsty." (Denton Dep. 27:6-28:7; Frost Dep. Ex. 8; Carney Dep. 25:13-26:12). Carney witnessed Zafar rip open the plastic on the case, remove the can, pour the entire can into a cup and drink it. (Denton Dep. 28:5-7; Carney Dep. 23:8-24:9). Carney testified that he warned Zafar not to drink the can because they did not yet know what testing was required of the product since no work order had been provided. (Carney Dep. 23:8-18, 24:24-25:4). Typically, the chemists do not know the reason that a product is brought to the Analytical Laboratory for testing until they are informed by the supervisor. (Pl. Dep. 48:11-49:4). In this particular instance, Denton had not informed any chemists in the Analytical Laboratory of the reason that case of Ensure© had been brought to the Laboratory for testing, and there had been no work order included with the case to provide the chemists with any directions on testing. (Pl. Dep. 48:11-23, 79:6-80:1; Denton Dep. 30:16-18; Carney Dep. 23:8-18, 24:24-25:4; James Dep. 55:10-56:10).

Denton walked over to Zafar and asked him if he drank the can of Ensure©, and Zafar replied that he had drank the can. (Denton Dep. 28:19-30:22). Denton then asked Zafar why he drank the can of Ensure©. (Denton Dep. 28:19-30:22; Frost Dep. Ex. 8). Zafar responded that, "We usually don't test all of the cans." (Denton Dep. 28:19-30:22). Denton memorialized the conversation in an email. (Frost Dep. Ex. 8). Concerned for his safety because the cans were brought to the Analytical Laboratory for testing due to issues arising during the sterilization process, Denton also checked on Zafar to make sure he felt okay, and he said that he did. (Denton Dep. 28:19-30:22; Frost Dep. Ex. 8). Denton observed that most of

[11] The deposition of Peter Carney was taken on October 19, 2015 and is cited as "Carney Dep." Copies of the relevant excerpts from the James deposition are attached as **Exhibit 11**.

the can had been consumed and there were only "a couple swallows left." (Denton Dep. 31:4-11).

Denton informed her manager, Darrington, of what occurred. (Denton Dep. 32:9-34:12; Darrington Dep. 49:3-51:15). As he typically does when any employee misconduct or policy violation issues arise, Darrington advised Denton to seek guidance from Abbott's Employee Relations Department ("ER"), which she did. (Denton Dep. 32:9-35:12; Darrington Dep. 49:3-51:15; Frost Dep. 70:4-71:1; Frost Dep. Ex. 19).

*2. Abbott's Investigation into Zafar's Conduct*

ER Manager Amy Frost investigated Zafar's conduct. (Frost Dep. 10:11-11:12, 16:11-17:9). Frost interviewed Denton regarding Denton's recollection of the events of August 6, 2014. (Frost Dep. 16:11-20:21, 56:8-57:4, 70:4-71:1; Frost Dep. Exs. 8, 19; Denton Dep. 35:21-38:25). She also obtained information from Denton regarding Zafar's recent performance and the procedures that his conduct may have violated. (Frost Dep. 16:11-20:21, 52:10-55:13, 66:6-67:13, 70:4-71:1; Frost Dep. Exs. 4-6, 17, 19; Denton Dep. 35:21-38:25). On August 12, 2014, Frost interviewed Zafar, who again admitted to drinking the can of Ensure©. (Frost Dep. 21:18-22:21, 67:17-69:23; Frost Dep. Exs. 18, 19). Frost took contemporaneous notes during her interview of Zafar. (Frost Dep. 23:24-25:13, 67:18-69:23, 71:5-72:10, 80:18-23; Frost Dep. Ex. 18, 20). Frost's interview notes reflect that Zafar told her that he drank the can because "usually [they] don't test the whole case," and he admitted that he did not drink the can for Flavor and Aroma Testing. (Frost Dep. 68:10-69:23, 79:8-80:23; Frost Dep. Ex. 18; Pl. Dep. 41:10-25). Frost's interview notes reflect that Zafar admitted that "[he] should not have done that." (Frost Dep. 68:10-69:23; Frost Dep. Ex. 18). Based on Zafar's admissions, Frost believed that additional interviews were not necessary. (Frost Dep. 81:16-83:22, 84:5-85:24). As part of her investigation, Frost confirmed that Zafar had been trained on each of the procedures that he

violated: SOP-ST-1000.08, Dress Code and Personal Hygiene and the Good Manufacturing Statement of Expectations. (Frost Dep. 83:23-84:4; Frost Aff. ¶¶ 9-11, Exs. A-B).

*3. Abbott's Termination Decision-Making*

Frost presented her investigative findings to Denton and Darrington. (Frost Dep. 25:14-26:15, 70:4-71:1; Frost Dep. Ex. 19). Denton and Darrington believed that Zafar's actions were serious and showed a disregard for (1) Abbott's procedures on which Zafar had been trained annually and (2) for Zafar's safety and the safety of Abbott's customers. (Denton Dep. 26:17-28:7, 39:1-42:5, 117:10-118:7; Darrington Dep. 48:14-49:2; **Exhibit 12**, Affidavit of Thomas Darrington ("Darrington Aff.") ¶¶ 3-6[12]). Denton and Darrington also believed Zafar's actions reflected very poor judgment. (*Id.*) For those reasons, in addition to Zafar's on-going performance deficiencies, Denton, with Darrington's approval, requested that Frost review Zafar for termination. (*Id.*; Frost Dep. 41:2-4, Frost Dep. Ex. 19).

Prior to a termination, management requests that ER review an employee for termination. (Frost Dep. 12:17-13:18, 80:24-81:10). ER must agree with the request and provide a termination recommendation in order for the termination to move forward. (Frost Dep. 80:24-81:10, 26:6-28:17). In this case, Frost concluded, based on her investigative findings and Zafar's admissions, that Zafar's behavior posed a threat to his own health and to Abbott product quality. (Frost Dep. 26:6-28:17, 58:5-59:10, 81:16-83:7; Frost Dep. Ex. 11). Frost further concluded that: Zafar’s actions were in disregard of Abbott's procedures; he had been trained on those procedures; his actions indicated very poor judgment; and, when coupled with his on-going performance deficiencies, warranted termination of his employment. (Frost Dep. 26:6-28:17, 81:11-83:7, 83:23-84:4; Frost Dep. Ex. 11, Frost Aff. ¶¶ 9-11, Exs. A-B). Accordingly, Frost

[12] The affidavit of Thomas Darrington is cited as "Darrington Aff." A copy of the Darrington Affidavit is attached as **Exhibit 12**.

approved the managers' request to terminate Zafar's employment. (Frost Dep. 26:6-28:4, 81:16-83:7; Frost Dep. Exs. 11, 19).

Darrington, Denton and Frost believed that the fact that it was later discovered that the case of Ensure© from which Zafar drank was not from the specific batch that needed to be tested was irrelevant to the termination decision, because Zafar had engaged in the improper conduct. (Frost Dep. 51:9-52:6, 85:2-14; Denton Dep. 31:12-32:8, 35:21-36:7; Denton Aff. ¶ 20; Darrington Dep. 49:20-51:4; Darrington Aff. at ¶ 7). Zafar was discharged on August 25, 2014. (Pl. Dep. 25:20-23). Another Sturgis facility employee, Zachary Holsinger (white, age 29), was terminated on January 29, 2015, for engaging in similar conduct as Zafar, including drinking cans of Ensure© for personal consumption, in violation of, among other things, the Dress Code and Personal Hygiene SOP. (Frost Aff. at ¶¶ 20-22, Ex. H).

Subsequent to Zafar's termination, Abbott filled the Assistant Chemist II first shift position using a seniority bidding process. (Denton Dep. 46:25-47:4). That process permitted all interested employees to bid on the position, and the bidding employee with the most seniority who met the qualifications of the position was awarded the position. (Denton Dep. 115:16-116:11; Carney Dep. 17:16-23). Kimberly Bush ("Bush") (white, age 44) was the most senior qualified bidder and was awarded the position. (Denton Dep. 46:25-47:22, 115:16-116:11; **Exhibit 13**, Defendant's Answers to Plaintiff's First Set of Interrogatories, at No. 8).

**D. Zafar's Allegations.**

*1. Allegations Supporting Zafar's Claim of Race and National Origin Discrimination*

Zafar's race and national origin is Indian. (Pl. Dep. 55:24-56:4; Complaint [ECF #1], at ¶ 1). Zafar claims that Abbott terminated his employment because of his race and national origin (Indian). (Complaint, Count I). Zafar admits that neither Darrington, nor any

other manager or supervisor at Abbott, ever made a derogatory statement to him related to his race or national origin. (Pl. Dep. 55:12-56:15). Zafar relies on the following to support his allegation of race and national origin discrimination: (1) the way in which Darrington talked to him, "[he] always thought [Darrington] was a pretty discriminatory guy"; (2) Darrington told him that "he was a lot smarter than [Zafar]"; (3) Darrington "was not very friendly at all"; (4) Darrington did not immediately, but eventually, approved two of Zafar's requests for a leave of absence; and (5) Darrington allegedly accused Zafar of lying when Zafar informed him that his supervisor gave him permission to work in another area of the plant during the annual plant shutdown. (Pl. Dep. 55:12-20, 60:21-65:9).

In this litigation, Zafar admits that he drank the can of Ensure©, but he now claims that he was performing a flavor test on the product as part of his job responsibilities. (Pl. Dep. 36:1-38:1, 52:21-25). Zafar claims that he was instructed to perform the flavor test on the product by his Team Leader, Mike James. (Pl. Dep. 36:1-38:1). Zafar, however, admits that he did not perform the alleged flavor test with a second person or document the results of the alleged flavor test, as required by the Flavor Testing SOP and Laboratory Method. (Pl. Dep. 38:2-40:1, 43:15-46:6; Denton Aff. at ¶¶ 8-10, Exs. B-C). For his part, James denies instructing Zafar to flavor test the can at issue. (James Dep. 55:10-25). James also denies ever informing Denton that Zafar flavor tested the product or that he instructed Zafar to flavor test the product. (**Exhibit 14**, Affidavit of Michael James at ¶¶ 4-6[13]). Additionally, Zafar has admitted that he never knew why the case of Ensure© had been brought to the Analytical Laboratory for testing. (Pl. Dep. 48:11-23, 79:6-80:1). Zafar alleges that he informed Denton a few weeks prior to his termination that he was performing a flavor test on the product at issue. (Pl. Dep. 40:3-7; Denton Aff. at ¶ 19).

[13] The affidavit of Michael James is cited as "James Aff." A copy of the James Affidavit is attached as **Exhibit 14**.

Zafar further alleges that Denton had indicated to Zafar that drinking cans of product in the Analytical Laboratory was an acceptable practice, although Zafar never drank any can of product in front of Denton. (Pl. Dep. 76:9-77:13). Zafar also speculates that other chemists drank product in the Analytical Laboratory that they were not testing. (Pl. Dep. 77:17-78:21, 80:2-81:7, 88:17-98:3). Carney admitted that he on occasion drank product in the Analytical Laboratory after all testing had been completed, but he never drank product in front of Denton or other supervisors. (Carney Dep. 20:9-23:7). At the time of making the decision to terminate Zafar's employment, Denton, Darrington and Frost were unaware that any other chemists had been drinking product in the Analytical Laboratory outside of testing purposes. (Denton Dep. 45:21-46:20, 116:23-117:9; Darrington Dep. 55:3-12, 160:11-18; Frost Dep. 83:8-22, 86:22-87:7; Pl. Dep. 77:10-13, 78:22-24, 80:11-81:1, 92:14-23, 94:13-15; Carney Dep. 20:1-23:7).

*2. Allegations Supporting Zafar's Claim of Age Discrimination*

Zafar further claims that Abbott terminated his employment because of his age. (Complaint, Count II). Zafar is 56-years-old. (Complaint [ECF #1], at ¶ 1). Zafar relies on the same evidence in support of his race and national origin discrimination claim to support his age discrimination claim. (Pl. Dep. 65:10-66:15). Zafar admits that neither Darrington, nor any other manager or supervisor at Abbott, ever made a derogatory statement to him related to his age. (Pl. Dep. 55:12-56:15).

## III. LEGAL ANALYSIS

### A. Zafar's Race, National Origin and Age Discrimination Claims Fail As A Matter of Law.

A plaintiff may prove that he was subject to discrimination based on race, national origin or age in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §

1981 ("Section 1981"), the Age Discrimination in Employment Act ("ADEA") and Michigan Elliott-Larsen Civil Rights Act using either direct or circumstantial evidence.[14] Where, as here, there is no direct evidence of discrimination, the plaintiff's circumstantial evidence is analyzed under the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *Chen v. Dow Chem. Co*., 580 F.3d 394, 400 (6th Cir. 2009). Under this framework, the burden is first on the plaintiff to demonstrate a *prima facie* case of race, national origin and/or age discrimination; it then shifts to the employer to offer a legitimate, non-discriminatory explanation for its actions; finally, the burden shifts back to the plaintiff to show pretext, *i.e*., that the employer's explanation was fabricated to conceal an illegal motive. *Id.*

In order to establish a *prima facie* case of discrimination, Zafar must show that (1) he was a member of a protected class; (2) he was discharged; (3) he was qualified for the position; and (4) he was replaced by a person outside the class, or a comparable non-protected person was treated better. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). Summary judgment must be granted on Zafar's race, national origin and age discrimination claims because he cannot satisfy the third or fourth elements of a *prima facie* case.

---

[14] The *McDonnell Douglas* evidentiary framework is applicable not only to claims brought under Title VII, but also to claims brought under Section 1981, the ADEA and Michigan Elliott-Larsen Civil Rights Act. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992); *see also Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 940 (6th Cir. 1987) ("For analytical purposes, Michigan's Elliott-Larsen Act resembles federal law, and the same evidentiary burdens prevail as in ADEA cases."); *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001) ("Section 1981 claims are analyzed under the Title VII *McDonnell Douglas/Burdine* framework."). Therefore, it is appropriate to analyze Zafar's Title VII, Section 1981, ADEA and Michigan Elliott-Larsen Civil Rights Act theories of discrimination together, particularly where, as here, the plaintiff admits that he relies on the same evidence in support of his race and national origin discrimination claim to support his age discrimination claim. *Mitchell*, 964 F.2d at 582 (stating that the district court "correctly 'lumped together'" the plaintiff's Title VII, ADEA and state law theories of discrimination when analyzing the factual and legal merits of the plaintiff's claims under the *McDonnell Douglas/Burdine* evidentiary framework); *see also* Pl. Dep. 65:10-66:15.

1. *Zafar Was Not Qualified for the Position, Because He Was Not Performing His Job To Abbott's Legitimate Expectations*

In order to establish a *prima facie* case of discrimination, Zafar must prove that he "was qualified for the position." *Mitchell*, 964 F.2d at 582. To show that he was qualified at the time of his termination, Zafar must show that he was performing "at a level which met [Abbott's] legitimate expectations." *See Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 929 (6th Cir. 1999). Zafar cannot satisfy this requirement. The undisputed evidence shows that Zafar's overall performance in 2013 was at a level of "Partially Achieved." (Pl. Dep. 51:14-20; Pl. Dep. Ex. 14; Denton Dep. 98:11-100:18, 104:22-108:23, 116:12-22; Denton Dep. Ex. 11). Zafar was not meeting the objective, minimal requirements of his position as a chemist. (*Id*.) Zafar's supervisor observed that Zafar failed to organize his time to complete the work in an efficient or timely manner, failed to follow through on projects and independently troubleshoot issues, and lacked knowledge regarding the instruments that his job necessitated he use and understand. (Pl. Dep. 51:14-20; Pl. Dep. Ex. 14; Denton Dep. 98:11-100:18, 104:22-108:23, 116:12-22; Denton Dep. Ex. 11). It is further undisputed that Zafar's performance deficiencies continued into 2014 and, at the time of his termination, his supervisor believed that he was trending towards another "Partially Achieved" overall performance rating. (Denton Aff. ¶16).

Accordingly, Zafar cannot prove that "he was qualified for the position" because he was not performing "at a level which met [Abbott's] legitimate expectations" at the time of his termination, and his claims must be dismissed as a matter of law. *See Bowie v. Advanced Ceramics Corp*., 72 F. App'x 258, 265 (6th Cir. 2003) (holding that where the plaintiff had "no positive performance evaluations, no promotions, no recommendations for promotion, and no history of employer satisfaction with his work […], even applying a lenient standard for

establishing the qualification prong of a *prima facie* case, [the plaintiff] cannot show that he performed his job in a way that met [his employer's] legitimate expectations"); *see also Jacklyn*, 176 F.3d at 929 (affirming district court's finding that the plaintiff failed to meet the third prong of the *prima facie* case where, leading up to her leave of absence, the plaintiff received a "needs improvement" evaluation and was required to complete a development plan to address deficiencies in her analytical and team sales skills).

*2. Zafar Cannot Show That Abbott Took Steps to Replace Him with a Person Outside the Class*

To satisfy the fourth prong of a *prima facie* case of discrimination, Zafar must show that he was replaced by a person outside of his class. *Mitchell*, 964 F.2d at 582. It is undisputed that Abbott used a seniority-based bidding system to fill Zafar's position. (Denton Dep. 46:25-47:22, 115:16-116:11; Carney Dep. 17:16-23). As such, Abbott did not take any affirmative steps to replace Zafar with an individual outside of his protected class, but rather Zafar's replacement was chosen through a neutral bidding process based on seniority. (*Id*.) Therefore, the fact that Zafar's replacement, Bush, is younger and outside of his class is immaterial where she was selected based solely on seniority. *See, e.g., Mills v. Phila. Gas Works*, No. 06-2444, 2007 WL 2071881, at *4 (E.D. Pa. July 19, 2007) (finding that the plaintiff did not satisfy the fourth element of the *prima facie* case where the selection process was based on seniority).

In fact, seniority systems "are afforded special treatment under Title VII." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 81-82 (1977). More specifically, Title VII, Section 703(h) states:

> Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a *bona fide* seniority system or merit system ... provided that such

> differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin.

Accordingly, because Zafar's position was filled utilizing a neutral seniority system, Zafar cannot establish a *prima facie* case of discrimination. *See, e.g., Marotta v. Ford Motor Co.*, No. 14-CV-11149, 2015 WL 4756523, at *15 (E.D. Mich. Aug. 11, 2015) *reconsideration denied sub nom. Marotta v. Ford Motor Co*., No. 14-CV-11149, 2015 WL 5336202 (E.D. Mich. Sept. 14, 2015) (granting summary judgment on plaintiff's gender discrimination claim on the basis that plaintiff failed to show that she was treated differently than similarly situated employees where reassignment of work was based on a seniority system).

*3. Zafar Cannot Show That Any Similarly Situated Employees Were Treated Differently Than Him*

Zafar can also satisfy the fourth prong of a *prima facie* case by showing that "a comparable non-protected person was treated better." *Mitchell*, 964 F.2d at 582. To satisfy the "comparable non-protected person was treated better" element, Zafar must produce evidence that establishes (1) that he was a member of a protected class and (2) that for the same or similar conduct he was treated differently than similarly situated younger or non-minority employees. *Id*. at 583. The Sixth Circuit states that in order for a plaintiff to demonstrate that a non-protected employee is similarly situated, he must prove that "all of the *relevant* aspects of his employment situation were 'nearly identical' to those of the [alleged comparator's] employment situation." *Jacklyn*, 176 F.3d at 929 (citations omitted). Furthermore, in order to be deemed similarly situated, "the individuals with whom the plaintiff seeks to compare [his] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, 964 F.2d at 583.

In this case, Zafar cannot point to any similarly situated employee who engaged in the same conduct as he did and was treated more favorably. To the contrary, Abbott terminated a younger and white employee who, like Zafar, was believed to have drank product in violation of the Dress Code and Personal Hygiene SOP. (Frost Aff. at ¶¶ 20-22, Ex. H).

Zafar may claim that other chemists were drinking product in the Analytical Laboratory, but Zafar stands alone as the only chemist who drank product intended for testing (a) before all testing was completed or (b) without knowledge of what testing was required of the product. Moreover, Zafar cannot demonstrate that any other chemist had his performance deficiencies. For these reasons as well, Abbott's motion must be granted.

*4. Zafar Cannot Show That Abbott's Legitimate, Non-Discriminatory Reason For His Termination Was Pretextual*

Even if Zafar could state a *prima facie* case of discrimination, which he cannot, his claims fail because he cannot show evidence of pretext. Once an employer establishes a legitimate, non-discriminatory reason for the plaintiff's termination, the employer is entitled to summary judgment unless the plaintiff can "produce sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired [him]." *Chen*, 580 F.3d at 400-01. In the Sixth Circuit, "a plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Id*. at 400. Zafar cannot show pretext in any of these manners.

Zafar admits that neither Darrington, nor any other manager or supervisor at Abbott, ever made a derogatory statement to him related to his race, national origin or age. (Pl. Dep. 55:12-56:15). Zafar's only evidence in support of his discrimination claims are as follows: (1) the way in which Darrington talked to him, "[he] always thought [Darrington] was a pretty

discriminatory guy"; (2) Darrington told him that "he was a lot smarter than [Zafar]"; (3) Darrington "was not very friendly at all"; (4) Darrington did not immediately, but eventually, approved both of Zafar's requests for a leave of absence; and (5) Darrington allegedly accused Zafar of lying when Zafar informed him that his supervisor gave him permission to work in another area of the plant during the annual plant shutdown. (Pl. Dep. 55:12-20, 60:21-65:9) These statements are insufficient to create a genuine issue of material fact as to whether Abbott's termination decision was motivated by Zafar's race, national origin or age. *See Strickland v. Fed. Express Corp.*, 45 F. App'x. 421, 425 (6th Cir. 2002) ("We have made clear before that 'isolated and ambiguous comments' are too abstract, in addition to being irrelevant and prejudicial, to support a claim of age discrimination." (internal citations omitted)); *see also Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir. 1993) (same).

Abbott terminated Zafar's employment after an investigation concluded that he violated Abbott's Dress Code and Personal Hygiene SOP and the Good Manufacturing Statement of Expectations when he drank a can of Ensure© that was meant for testing. Zafar's managers believed his actions reflected (1) a blatant disregard for Abbott's procedures on which he had been trained annually, (2) a blatant disregard for his safety and the safety of Abbott's customers and (3) very poor judgment. (Denton Dep. 26:17-28:7, 39:1-42:5, 117:10-118:7; Darrington Dep. 48:14-49:2; Darrington Aff. at ¶¶ 3-6; Frost Dep. 41:2-4, Frost Dep. Ex. 19). While Zafar may disagree with Abbott's conclusions, the Sixth Circuit has "adopted an 'honest belief' rule with regard to an employer's proffered reason for discharging an employee," which has been explained as follows:

> Under this rule, as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect. An employer has an honest belief in its reason for discharging an

> employee where the employer reasonably relied on the particularized facts that were before it at the time the decision was made.

*Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (citations and quotations omitted). Zafar cannot show that Abbott's belief was not honestly held.

Even if Zafar's speculations that other chemists were drinking product in the Analytical Laboratory were accepted as true, it is undisputed that each of the termination decision makers – Denton, Darrington or Frost – were unaware that any other chemists had been drinking product in the Analytical Laboratory outside of testing purposes. (Denton Dep. 45:21-46:20, 116:23-117:9; Darrington Dep. 55:3-12, 160:11-18; Frost Dep. 83:8-22, 86:22-87:7; Pl. Dep. 77:10-13, 78:22-24, 80:11-81:1, 92:14-23, 94:13-15; Carney Dep. 20:1-23:7). Each of the decision makers testified that they never had any reason to suspect the existence of such a practice to cause them to investigate the matter further. (*Id*.) While Zafar may believe that such circumstances are unfair, Zafar cannot dispute the fact that the decision makers honestly believed his conduct warranted termination based on the facts before them, and whether the employer honestly described its reasons for discharging the plaintiff is the only relevant inquiry. *See Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004) ("[I]t is inappropriate for the judiciary to substitute its judgment for that of management. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior.") (citations omitted).

Even when viewing Zafar's allegations in a light most favorable to him, including his allegations that (1) he was actually flavor testing the product; (2) he was instructed to do so by his Team Leader; and (3) he informed Denton prior to his termination that he was flavor testing the product, Zafar's claims still must be dismissed. The following undisputed facts support Denton and Darrington's reasonable-good-faith decision not to believe Zafar's claim that he was flavor testing the product:

(1) The required testing on the case of Ensure© did not include Flavor Testing (Denton Dep. 30:12-15; Frost Dep. 67:17-69:23, 79:8-80:23; Frost Dep. Ex. 18);

(2) Denton had not informed any chemists in the Analytical Laboratory as to why the case of Ensure© had been brought to the Laboratory for testing, and there had been no work order included with the case to provide the chemists with any directions on testing, and, indeed, Zafar admits that he never knew why the case of Ensure© had been brought to the Analytical Laboratory for testing (Pl. Dep. 48:11-23, 79:6-80:1; Denton Dep. 30:16-18; Carney Dep. 23:8-18, 24:24-25:4; James Dep. 55:10-56:10);

(3) Denton observed that most of the can had been consumed, with only "a couple swallows left," which was inconsistent with the amount of product consumed in Flavor Testing (Denton Dep. 31:4-11, 113:1-114:25, Denton Aff. at ¶¶ 8, 10, 19, Ex. C);

(4) The chemists were trained to perform the Flavor Testing with a second person and to electronically record the data from the Flavor Testing, which Zafar did not do (Pl. Dep. 38:2-40:1, 43:15-46:6; James Dep. 30:21-31:9; Denton Dep. 113:1-114:25, Denton Aff. at ¶¶ 8-11, Exs. B-D); and

(5) Denton recalled that when she asked Zafar why he drank the can of Ensure©, his response was that "[w]e usually don't test all of the cans," as recorded in an email she wrote memorializing their conversation (Denton Dep. 28:19-30:22; Frost Dep. Ex. 8).

(*See also* Denton Aff. at ¶ 19). In addition, Frost's interview notes reflect that Zafar told her that he drank the can because "usually [they] don't test the whole case," and he admitted that he did not drink the can for Flavor and Aroma Testing. (Frost Dep. 68:10-69:23, 79:8-80:23; Frost Dep. Ex. 18; Pl. Dep. 41:10-25). Therefore, even if Zafar had been flavor testing the product when he consumed the can of Ensure©, at most, Zafar can prove that Abbott's honest belief for terminating Zafar's employment was arguably incorrect.

However, "[a]n employer has an honest belief in its reason for discharging an employee where the employer reasonably relied on the particularized facts that were before it at the time the decision was made." *Majewski*, 274 F.3d at 1117; *see also Chen*, 580 F.3d at 401 ("When an

employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext, even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'"); *see also Hedrick*, 355 F.3d at 462 ("Our role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments.") (citations omitted). Here, it is undisputed that Abbott reasonably relied on the facts uncovered during its investigation when it made the decision to terminate Zafar's employment. Accordingly, because Abbott's belief in the reasoning for Zafar's termination was honestly held, Abbott is entitled to summary judgment on Zafar's race, national origin and age discrimination claims.

## IV. CONCLUSION

For these reasons, the Court should grant Abbott's Motion for Summary Judgment.

Dated: December 21, 2015

GOLDBERG KOHN LTD.

Attorneys for Defendant

Abbott Laboratories (incorrectly identified as
Abbott Laboratories, Inc.)

By: /s/ Jon E. Klinghoffer
Jon E. Klinghoffer (IL Bar No. 6270082)
Kristen A. Jones (IL Bar No. 6300135)
Business Address
55 East Monroe Street, Suite 3300
Chicago, Illinois 60603
Telephone: (312) 201-4000
jon.klinghoffer@goldbergkohn.com
kristen.jones@goldbergkohn.com