UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ABU ZAFAR, an individual,

Plaintiff,

v

Case No. 1:15-cv-0361

ABBOTT LABORATORIES, INC.,
a corporation,

HON. GORDON J. QUIST

Defendant.

Jon E. Klinghoffer (IL Bar No. 6270082)
Kristen A. Jones (IL Bar No. 6300135)
**Attorneys for Defendant**
GOLDBERG KOHN LTD.
55 East Monroe Street
Suite 3300
Chicago, Illinois 60603
(312) 201-4000
jon.klinghoffer@goldbergkohn.com
kristen.jones@goldbergkohn.com

Keith E. Eastland (P66392)
Sarah K. Willey (P57376)
MILLER JOHNSON
**Attorneys for Defendant**
250 Monroe Avenue, NW, Suite 800
Grand Rapids, MI 49503
(616) 831-1700
eastlandk@millerjohnson.com
100 West Michigan Avenue, Suite 200
Kalamazoo, MI 49007
(269) 226-2950
willeys@millerjohnson.com

**DEFENDANT ABBOTT LABORATORIES EXHIBITS E-H OF DEFENDANT'S EXHIBIT 4 TO DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT E

# ER INVESTIGATION SUMMARY

| | | |
|---|---|---|
| Date Case Opened: | 1/29/15 | Date Case Closed: |
| ER Ticket Number: | 100023836 | Subject Name: Carter McLeod, Analytical Lab 3rd shift Supervisor, ANSC, Sturgis |
| ER Manager: | Amy Frost | |
| Division: | ANSC/Sturgis | Subject's Manager: Tom Darrington |
| | | |

**Allegation(s) Made / Concerns Raised:**

**Policy Violation: Workplace Harassment Policy**

- On 1/29/15, Employee Relations was notified by Tom Darrington that an employee came forward with concerns about Carter McLeod's behavior towards her and other co-workers were causing the team to feel uncomfortable. Specifically, allegations include the following:
  - Mr. McLeod approached a contractor from behind and said, "Oh so you like it from behind.'
  - Mr. McLeod has picked up subordinates from behind and has tugged on an employee's ponytail.
  - Mr. McLeod had subordinates falsify records to include his name on STOP card observations, despite the fact that he did not participate in the observation.
  - Mr. McLeod directed a subordinate to falsify a shift note email communication that he was present on shift at 22:00 EST on 1/18/15 when in fact he was not on site (badge records indicate he did not enter the plant until 11:48 pm EST).
  - Mr. McLeod is often not at the plant during shift start time of 11:30 am EST.

**Interviews:**

Reporter:
- Renee Schumacher, Assistant Chemist III 013015

Witnesses:
- Deanna Denton, 1st shift Analytical Lab Supervisor 020315
- Tom Darringon, Manager, Analytical Lab (of Carter McLeod) 012915
- Rebecca Nichols, Assistant Chemist III 020415
- Dan Tabisula, Assistant Chemist II020415
- Kim Bush, Chemist (formerly on 3rd shift, now on 1st shift) 020415
- Latisse Wertman, Assistant Chemist I, 3rd shift 020515
- Vanessa Greenfield, Assistant Chemist I, 3rd shift 020415

Subject:
- Carter McLeod, Supervisor Analytical Lab, 3rd shift 020515



*THIS DOCUMENT IS INTENDED FOR THE SOLE USE BY ABBOTT EMPLOYEE RELATIONS PERSONNEL INVOLVED WITH THE DECISION MAKING PROCESS OF THE CURRENT INVESTIGATION. DO NOT DISTRIBUTE. FOR ER USE ONLY.*

CONFIDENTIAL AZAFAR008474

**Documentation Reviewed:**

Carter McLeod's outlook file
Badge entry and exit records for Carter McLeod
Email regarding Shift Notes and STOP Card observations
ER history
Abbott's Workplace Harassment Policy
Abbott Code of Business Conduct

**Investigative findings:**

Employee Relations conducted interviews with several members of the Analytical Lab 3rd shift department who corroborated the allegations listed above.
Common theme during interviews is that Mr. McLeod is not supportive of the team, is argumentative with staff when they have questions about processes; and that he brings the team down negatively when he enters the room. Team did stated that Mr. McLeod is often not at work during the start of the shift.

During Mr. McLeod's interview with Employee Relations, he admitted to physically lifting up employees off the ground during work; attending parties off-shift with his staff; and to making the sexual overtone comment to a contractor.

Also, when Mr. McLeod was asked if he directed his subordinate to falsify his start time on the shift report as 22:00 EST (10:00 pm), he admitted to giving this directive and speculated that he may have miscommunicated the time, but stated he was in the plant at 10:30 pm EST. When presented with the fact that badge entry records showed that he did not enter the plant until 11:48 pm EST, his explanation changed that he was in the plant parking lot working on his laptop in his car at 10:30 pm EST, which was perceived by the investigative team as self-serving and not credible.
Mr. McLeod was suspended with pay after ER interview on 2/5/15 pending the outcome of the investigation.

**Conclusion:**

Founded: Mr. McLeod has violated Abbott Workplace Harassment Policy by touching his staff; making sexual comments; and creating an uncomfortable work environment. Also, his action of directing subordinates to falsify the shift report to cover up for him is not only inappropriate and inconsistent with expectations of an Abbott leader, it is a violation of Abbott's Code of Business Conduct Accurate Books and Records.



*THIS DOCUMENT IS INTENDED FOR THE SOLE USE BY ABBOTT EMPLOYEE RELATIONS PERSONNEL INVOLVED WITH THE DECISION MAKING PROCESS OF THE CURRENT INVESTIGATION. DO NOT DISTRIBUTE. FOR ER USE ONLY.*

CONFIDENTIAL AZAFAR008475

# EXHIBIT F

ER notes 100023836

Amy Frost

Call with Tom Darrington 1/29/15 discussed concerns that were brought to his attention.

On Renee Schumacher's boyfriend Sean Merrell told his supervisor Kim Brandys about allegations that Renee made about Carter McLeod's behavior.

Kim told Susan Elgan, who then told Tracey Nielsen Trine, BHR who involved Tom Darrington, Carter's manager.

Renee had made allegations that recently Carter McLeod made sexual comment to new contractor Kaitlyn Cain and said to her "oh so you like it from behind". Renee has encountered interactions with Carter also that have made her feel uncomfortable.

Amy had call with Renee on 1/30/15. See attached.

Interviews were conducted with several employees in Carter's department on 2/4 and 2/5/15.

Carter was interviewed by ER on 2/5/15 and suspended with pay pending outcome of investigation.

Findings shared with BHR Tracey Nielsen Trine and Tom Darrington on 2/5 and 2/6/15.

Founded for violation of Sexual Harassment Policy and COBC.

Management decided to terminate employment.

ER reviewed and approved termination 2/9/15, sent to BHR for approval on 2/9/15.

Approved by Division and HR on 2/12/15. Sent Term script to Tom Darrington.

Tom and Tracey to call Carter 2/12/15.

Call from Tom at 3pm cst, that he and Tracey spoke with Carter over the phone and had the separation discussion with him at 3:20 pm EST. Call went without incident.

Tom to fed ex Carter's personal items and send him fed ex box to return his laptop and badge.

Closed ticket 2/12/15.

See ER Investigation Summary and other notes in file.

# EXHIBIT G

## ER Recommendation for Termination Worksheet

| | | | | | |
|---|---|---|---|---|---|
| **Employee Name:** | Carter McLeod | **Div/Dept.# :** | ANSC/RP201400 | **Date:** | 2/6/15 |
| **ER Rep. – BHR:** | Amy Frost – ER<br>Tracey Nielsen-Trine-BHR | **Start Date:** | Original hire date: 4/1/96; adjusted start date 8/7/06 | **Job Title:** | Analytical Lab Supervisor |
| **Immediate Supv/Mgr:** | Tom Darrington | **Supv/Mgr Title:** | Manager, Plant Analytical and Incoming Materials Lab | **Grade:** | 15 |
| **Next Level Mgr:** | Susan Elgan, Manager Plant QA | | | **UPI:** | 10011318 |

**Previous Counseling History (if Applicable):**

| Date | Performance Issues | Relevant Policy/Guideline | Disciplinary Action |
|---|---|---|---|
| 10/20/14 | Performance: Unprepared for FLL 90 day Report Out; late for meetings, not in the plant during shift hours; prioritizing responsibilities. | | Documented Verbal Discussion |

**Performance Review History (Previous 2 Years)**

| | | |
|---|---|---|
| 2014 Performance | Rating: | AE |
| 2013 Performance | Rating: | AE |

**Reason for Termination (Performance Summary):**

**Recommendation:**

Carter McLeod's behavior is not in line with Abbott's expectations as a leader. In summary, Mr. McLeod has not created a mutually respectful and trusting environment, or been able to demonstrate strong leadership by communicating in a manner that leads and motivates his team, as expected of all managers. Instead, he has fostered the opposite through unprofessional communications, inappropriate behaviors and poor judgment, ultimately having a negative impact on his team and the overall work environment. For this, termination is recommended for demonstrating an ongoing pattern of behavior that is not consistent with Abbott's expectation of its leaders.

**Policy Violation: Workplace Harassment Policy**

- On 1/29/15, Employee Relations was notified by Tom Darrington that an employee came forward with concerns about Carter McLeod's behavior towards her and other co-workers were causing the team to feel uncomfortable. Specifically, allegations include the following:
  - Mr. McLeod approached a contractor from behind and said, "Oh so you like it from behind.'
  - Mr. McLeod has picked up subordinates from behind and has tugged on an employee's ponytail.
  - Mr. McLeod had subordinates falsify records to include his name on STOP card observations, despite the fact that he did not participate in the observation.
  - Mr. McLeod directed a subordinate to falsify a shift note email communication that he was present on shift at 22:00 EST on 1/18/15 when in fact he was not on site (badge records indicate he did not enter the plant until 11:48 pm EST).
  - Mr. McLeod is often not at the plant during shift start time of 11:30 am EST.

**Summary of Investigation/Conclusion**

**Confidential**

THIS DOCUMENT IS INTENDED FOR THE SOLE USE BY ABBOTT HUMAN RESOURCES INVOLVED WITH THE DECISION MAKING PROCESS OF THE CURRENT ER RECOMMENDATION AND IS NOT INTENDED TO BE COPIED OR DISTRIBUTED.

Employee Relations conducted interviews with several members of the Analytical Lab 3rd shift department who corroborated the allegations listed above.

During Mr. McLeod's interview with Employee Relations, he admitted to physically lifting up employees off the ground during work; attending parties off-shift with his staff; and to making the sexual overtone comment to a contractor.

Also, when Mr. McLeod was asked if he directed his subordinate to falsify his start time on the shift report as 22:00 EST (10:00 pm), he admitted to giving this directive and speculated that he may have miscommunicated the time, but stated he was in the plant at 10:30 pm EST. When presented with the fact that badge entry records showed that he did not enter the plant until 11:48 pm EST, his explanation changed that he was in the plant parking lot working on his laptop in his car at 10:30 pm EST, which was perceived by the investigative team as self-serving and not credible.

**Conclusion:**
Founded: Mr. McLeod has violated Abbott Workplace Harassment Policy by touching his staff; making sexual comments; and creating an uncomfortable work environment. Also, his action of directing subordinates to falsify the shift report to cover up for him is not only inappropriate and inconsistent with expectations of an Abbott leader, it is a violation of Abbott's Code of Business Conduct Accurate Books and Records.

Termination of employment is recommended.

**Is the employee currently suspended?**

☑ **Yes** ☐ **No**

**Special Requirements for final paycheck?**

☐ **Yes** ☑ **No**

Note: Laws in **CA, CO, HI, MA, MO, NV, require** the final paychecks to be **delivered to the employee on the date of termination.**
Laws in **CT, DC, MN, NH, OR, TX, UT, VT, WV, WY**, **require** the final paychecks **to meet special provisions.**

**Confidential**
THIS DOCUMENT IS INTENDED FOR THE SOLE USE BY ABBOTT HUMAN RESOURCES INVOLVED WITH THE DECISION MAKING PROCESS OF THE CURRENT ER RECOMMENDATION AND IS NOT INTENDED TO BE COPIED OR DISTRIBUTED.

# EXHIBIT H

## ER Recommendation for Termination Worksheet

| | | | | | |
|---|---|---|---|---|---|
| **Employee Name:** | Zachary Holsinger | **Div/Dept.#:** | AN Sturgis | **Date:** | 1/15/2014 |
| **ER Rep. – BHR:** | Deborah Boskovic<br>Tracey Nielsen-Trine | **Start Date:** | 11/24/2014 | **Job Title:** | Utility |
| **Immediate Supv/Mgr:** | Colleen Nestorios | **Supv/Mgr Title:** | Front Line Leader II | **Grade:** | 6 |
| **Next Level Mgr:** | TJ Hathaway | | | **UPI:** | 10779761 |

**Previous Counseling History (if Applicable):**

| Date | Performance Issues | Relevant Policy/Guideline | Disciplinary Action |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

**Performance Review History (Previous 2 Years)**

| | | |
|---|---|---|
| 2014 Performance | Rating: | n/a |

**Reason for Termination (Performance Summary):**

On 1/13/2015, Senior Leader Front Line, TJ Hathaway, contacted Employee Relations (ER) regarding allegations involving Mr. Zachary Holsinger, who was recently hired into a Utility role at the Abbott Nutrition Sturgis Plant on 11/24/2014. Specifically, that Mr. Holsinger has been taking damaged cans of Ensure product from the 8 oz line for personal consumption. For this termination is being recommended.

On 1/12/2015 Utility, Mr. Cody Reddick, reported to his supervisor that there were damaged cans of Ensure from departmental refrigerator and voiced concerns with training Mr. Holsinger. Specifically, Mr. Reddick reported that 12/29/2014 Mr. Holsinger asked him and another colleague (Jason Cook) whether he could save the damaged cans versus discarding the product. Both told him that he must discard, and to save and drink would be a violation of Abbott policy. Mr. Reddick also reported that Mr. Holsinger made the statement that he was "new and could play dumb for 6 months." Despite these communications, Mr. Reddick stated that he witnessed Mr. Holsinger later that day retrieving damaged cans, placing them in his forklift and driving off. This time, another colleague (Nate Langworthy) followed up and instructed Mr. Holsinger to discard the product.

Mr. Hathaway and Front Line Leader, Mr. David Hamlin, corroborated the witnesses' accounts. In addition, Mr. Langworthy reported that Mr. Holsinger had asked him in the beginning of December 2014 if he could take the damaged product and drink during his breaks, to which he received the same answer that he should not. Management also learned that on 1/12/2015 Mr. Jason McClimmans, Utility, had also communicated to Mr. Holsinger that he should not keep or drink damaged product and that people have been fired for such actions.

On 1/13/2015 management spoke with Mr. Holsinger who admitted to taking the product for his personal consumption. Mr. Holsinger told management he had only just learned that he should not take product from Mr. McClimmans on 1/12/2015. When questioned whether three of his 2nd shift peers had also communicated this to him, he admitted that he had been told previously, contradicting his original statement. Mr. Holsinger told management that he was "unclear" until Mr. McClimmans told him. When asked what was unclear about three other peers telling him that he must discard damaged cans, Mr. Holsinger stated several times that he had a hard time discarding something that could be used and "just couldn't bring himself to get rid of it." When asked about the alleged statement that he could "play dumb," he stated he didn't say it exactly like that, but that he could "ask a lot of questions now that he can't ask in 6 months."

During his interview with ER on 1/14/2015, Mr. Holsinger explained he "saw them throw away perfectly good product" and he

**Confidential**
THIS DOCUMENT IS INTENDED FOR THE SOLE USE BY ABBOTT HUMAN RESOURCES INVOLVED WITH THE DECISION MAKING PROCESS OF THE CURRENT ER RECOMMENDATION AND IS NOT INTENDED TO BE COPIED OR DISTRIBUTED.

thought it was "ok" to take and drink the product. He elaborated that he assumed it was a healthy drink, tasted "really good" and "didn't think there was any harm." He stated that he couldn't recall his training. He further explained that while his peers had told him that he must discard damaged product and not save for personal consumption, they didn't have a "clear cut answer" as to the reason why and that he was unaware of the consequences until, Mr. McClimmans explained he could lose his job. When asked about the statement that he "could play dumb," he stated that he had actually said, "I can ask management questions because I don't know any better." ER then asked him if he realized he could ask management questions, why did he not seek clarification from his management, he had no explanation.

In addition, to his peers communications, Mr. Holsinger was also made aware that he should not take damaged cans through the following communications/trainings:

- During his new hire orientation, EH&S reviews the Scrap Removal Policy which states, "Cans of product are not one of the allowed items for removal." In this case, even though cans of product are not one of the allowed items for removal, if they had been, he failed to get proper authorization from his leadership team.
- The Line Clearance Procedure ST-1000.04 - D.8, which he was trained on 11/25/14 that states, "Containers found off the product path are discarded regardless of where they are found. Examples included but are not limited to the floor, on top of equipment and between equipment." Here, Mr. Holsinger violated this procedure by removing and not discarding the cans damaged at the palletizer.
- Food/Beverage procedure – ST-1000.08 – which he was trained on 11/25/14 that states, "Food, beverage, candy, chewing gum . . . or other similar items will not be consumed, used, carried or stored in manufacturing, processing . . . laboratory or locker room areas." Once Mr. Holsinger took the cans from the palletizer area, these are considered food that he is transporting through the plant, which is prohibited.

In summary, Mr. Holsinger's actions of continuing to take Ensure product from the 8 oz line for personal consumption, demonstrated a total disregard of the training and expectations he was trained on and reminded of on multiple occasions. His rationale for this disregard is self-serving and not credible. His intentional disregard of the directives is also perceived as a lapse in judgment, calling into question his integrity, and were a violation of the Code of Business Conduct: Principle 1: Fair Dealing "We will deal honestly and ethically with Abbott and on Abbott's behalf in all matters;" and Principle 9: Compliance with Abbott Standards, Policies and Procedures, "We will comply with all Abbott standards, policies and procedures applicable to our work responsibilities. For this, termination is being recommended.

**Is the employee currently suspended?**

☐ **Yes** ☑ **No**

**Special Requirements for final paycheck?**

☐ **Yes** ☑ **No**

Note: Laws in **CA, CO, HI, MA, MO, NV, require** the final paychecks to be **delivered to the employee on the date of termination.**
Laws in **CT, DC, MN, NH, OR, TX, UT, VT, WV, WY**, **require** the final paychecks **to meet special provisions.**

**Confidential**
THIS DOCUMENT IS INTENDED FOR THE SOLE USE BY ABBOTT HUMAN RESOURCES INVOLVED WITH THE DECISION MAKING PROCESS OF THE CURRENT ER RECOMMENDATION AND IS NOT INTENDED TO BE COPIED OR DISTRIBUTED.