UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

ABU ZAFAR,

       Plaintiff,

v.                                     Case No. 1:15-CV-361

ABBOTT LABORATORIES, INC.,            HON. GORDON J. QUIST

       Defendant.

_____/

**<u>OPINION</u>**

Plaintiff, Abu Zafar, a chemist employed by Defendant, Abbott Laboratories, Inc.,  drank a can of Ensure nutritional beverage from a case of product that was sent to Abbott's Analytical Laboratory for testing.  Abbott determined that Zafar's conduct violated Abbott's Dress Code and Personal Hygiene Procedure and Good Manufacturing Statement of Expectations and terminated his employment.  Zafar claims that Abbott discriminated against him based on his race, national origin, and age, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* (Title VII), 42 U.S.C. § 1981, the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, and the Michigan Elliott-Larsen Civil Rights Act (ELCRA), M.C.L. §§ 37.2101, *et seq.*

Abbott has filed a motion for summary judgment, arguing that Zafar's claims fail as a matter of law because he cannot establish a prima facie case of discrimination.  Abbott further argues that, even if Zafar can establish a prima facie case, he cannot show pretext.  Having read the parties' materials and heard oral argument on May 6, 2016, the Court is fully informed on the matter.

For the following reasons, the Court will grant Abbott's motion for summary judgment and dismiss Zafar's complaint with prejudice.

## I. FACTS

Abbott is a manufacturer of health-care-related products, including liquid nutrition products, such as infant formula marketed under the Similac and Isomil brands, and Ensure, a nutritional supplement containing vitamins and minerals. (ECF No. 37-1 at PageID.137–38; ECF No. 37-5 at pageID.379.) Abbott hired Zafar, who is of Indian descent, on June 2, 1997, as an at-will Chemist I to work in the Analytical Laboratory at its Abbott Nutrition division facility in Sturgis, Michigan. (ECF No. 37-2 at PageID.237; ECF No. 37-4 at PageID.361.) Zafar was subsequently promoted to a Chemist II position. (ECF No. 37-2 at PageID.238.) Neyaz Hussain, who was also of Indian descent, initially supervised Zafar and remained his supervisor until 2006. (*Id.* at PageID.239.)

Chemists employed in the Analytical Laboratory perform both routine and issue-specific testing of product or ingredient. (ECF No. 37-1 at PageID.138.) Chemists test for a product's vitamins; minerals; fats; proteins; stability, including flavor, aroma or pH levels; and density, moisture or sediment in powders. (ECF No. 37-2 at PageID.243.) All testing is required to be conducted in accordance with written detailed procedures to ensure that Abbott's quality standards are met. (*Id.* at PageID.241; ECF No. 37-1 at PageID.138.) Abbott's procedures and specifications include Flavor Testing Standard Operating Procedure (SOP) and related Laboratory Method and the Abbott Nutrition Good Manufacturing Statement of Expectations. (*Id.* at PageID.138–39.) Abbott's chemists, including Zafar, received annual training on these procedures and policies. (ECF No. 37-2 at PageID.241; ECF No. 37-4 at PageID.359.) Pursuant to the Flavor Testing SOP and Laboratory Method, at least two chemists are required to participate in each flavor testing, and they are to only take one or two sips to perform the analysis and record their data in electronic form. (ECF No. 37-2

2

at PageID.243; ECF No. 37-7 at PageID.457.)   The Good Manufacturing Statement of Expectations requires that the employee follow all applicable policies and procedures that the employee is required to know for the job, understand the requirements of the procedures and any training and ask for clarification of any duties if necessary, and follow the dress code, personal hygiene practices, and established housekeeping requirements while inside the facility in order to protect against food contamination.  (ECF No. 37-1 at PageID.139, 231.)  In addition, Abbott's Dress Code and Personal Hygiene SOP-ST-1000.08, which specifies procedures to protect consumers and employees, prohibits employees from consuming food, beverages, candy, chewing gum, and other items in various locations, including laboratories.  (ECF No. 37-1 at PageID.211–12.)

In 2014, Zafar was assigned to the first shift in the Analytical Laboratory.  Mike James was one of Zafar's Team Leaders, Deanna Denton was the first shift Supervisor, and Thomas Darrington was the laboratory Manager, as well as Denton's supervisor.  (ECF No. 37-2 at PageID.238–39.)

For several years prior to his termination, Zafar's supervisors had identified issues in Zafar's performance.  In 2010, Zafar's then-supervisor James Nelson gave Zafar an overall performance rating of "Achieved Expectations"[1] (AE) but commented that he would like to see Zafar "consistently focus on leaving his area clean, organized, and caught up before the next shift."  (ECF No. 37-3 at PageID.330.)   The following year, 2011, Nelson again gave Zafar an overall performance rating of AE, but noted that chemists who followed Zafar on the second shift continued to complain about Zafar and thus assigned him a lower "Partially Achieved" (PA) rating in the core competency area of "Adaptability."  (*Id.* at PageID.337–38.)  In 2012—her first year as Zafar's supervisor—Denton gave Zafar an overall performance rating of AE, but gave him a PA in the core

---

[1]Abbott's performance ratings, in order of best to worst, are "Exceeds Expectations," "Achieved Expectations," "Partially Achieved Expectations," and "Did Not Achieve Expectations."  (ECF No. 37-3 at PageID.328.)

3

competency category of adaptability, based on continuing complaints from second shift chemists. She also gave Zafar a PA in the core job responsibility category of "Adherence to Good Manufacturing Practices," noting that "Abu has been reminded that he needs to follow work order specifications. This has led to untimely delivery of results on some occasions. On several occasions, his failure to follow workorder specifications has led to late retesting of samples that have held up releases." (*Id.* at PageID.341, 346.) The following year, Denton gave Zafar an overall rating of PA. Denton wrote, "Abu is partially achieving in his current role. He needs to follow through on projects that he starts. Abu seems to need much direction when working on issues with troubleshooting, and he needs to take the initiative to learn the instruments so he can become more valuable to the team." (*Id.* at PageID.355.)

On August 6, 2014, a case of Ensure was delivered to the Analytical Laboratory for testing because Abbott had determined that a batch of Ensure was out of specification during the sterilization process. (ECR No. 37-7 at PageID.436.) Although the testing order had not been submitted to the laboratory personnel, the entire 24-can case was to be inspected for bulges and the contents tested to determine the physical stability of the product. (*Id.*; ECF No. 37-5 at PageID.384.) Flavor testing was not part of the testing to be performed on the case of Ensure. (ECF No. 37-7 at PageID.436.) As Denton was walking through the laboratory, she saw the case of product and noticed that the plastic had been ripped open and a can was missing. (*Id.* at PageID.435; ECF No. 37-10 at PageID.434.) Denton asked chemist Peter Carney what happened to the can and Carney responded that Zafar drank it because he was thirsty. (*Id.* at PageID.435; ECF No. 37-11 at PageID.518.) Denton then asked Zafar if he drank the can of Ensure, and Zafar admitted that he had done so. When Denton asked Zafar why he drank it, Zafar responded that they usually didn't test all of the cans. (*Id.* at PageID.436.) Concerned for Zafar's safety, Denton asked

4

Zafar how he felt and Zafar said that he was okay. (*Id.*) Denton then looked at the can and observed that most of the liquid had been consumed, with just a couple of swallows left. (*Id.*)

Denton went to Darrington and informed him of the situation. Darrington told Denton to contact Abbott's Employee Relations (ER) Department. (*Id.* at PageID.436–37.) ER Manager Amy Frost was assigned to investigate Zafar's conduct. (ECF No. 37-9 at PageID.467.) Frost interviewed Denton about her recollection of the events of August 6, 2014. Denton subsequently sent Frost information regarding Zafar's recent performance and the procedures that his conduct may have violated. (*Id.* at PageID.468.) On August 12, 2014, Frost interviewed Zafar by phone. During the interview, Zafar admitted drinking the can of Ensure. Zafar said that he drank it because they usually do not test the whole case, and he admitted that he did not drink the can for flavor and aroma testing. (*Id.* at PageID.482.) Zafar also admitted that he "should not have done that." (ECF No. 37-10 at PageID.505.) In light of Zafar's admissions, Frost determined that further interviews were unnecessary. (ECF No. 37-9 at PageID.483.) Following the interview, Frost confirmed that Zafar had been trained on the procedures that he had violated by drinking the can of Ensure. (*Id.*)

Frost reported her investigation findings to Denton and Darrington and asked Denton for her recommendation. (ECF No. 37-7 at Page ID.438.) Denton recommended that Zafar be terminated because she viewed his conduct as serious, in that it showed a disregard for Zafar's own safety, as well as the safety of Abbott's customers, and disregard for Abbott's policies, on which Zafar had been trained. (*Id.* at PageID.458.) Darrington concurred with Denton's recommendation. (ECF No. 37-6 at PageID.400.) Frost reviewed the termination request on behalf of ER and concluded that the request was supported by her investigative findings. (ECF No. 37-9 at PageID.470.) Frost also obtained approval for the termination from two senior ER managers. Frost then prepared a termination script for Denton to use when she notified Zafar of the termination. (*Id.* at PageID.471.)

Zafar was terminated on August 25, 2014.  At some point it was discovered that the case of Ensure from which Zafar drank a can was not from the specific batch that need to be tested.  However, management concluded that this fact was irrelevant because Zafar had still engaged in improper conduct.  (ECF No. 37-1 at PageID.140.)

Abbott filled Zafar's Chemist II first-shift position using its seniority bidding process, which allowed the bidding employee with the most seniority and appropriate qualifications to fill the position.  (ECF No. 37-7 at PageID.457.)  Kimberly Bush, who is white and was 44 years old at the time, was awarded the position.  (*Id.* at PageID.440.)

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56.  Material facts are facts which are defined by substantive law and are necessary to apply the law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  A dispute is genuine if a reasonable jury could return judgment for the non-moving party.  *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

## III.  DISCUSSION

Zafar alleges that Abbott engaged in unlawful discrimination by terminating him on the basis of his race, national origin, and age, in violation of Title VII, the ADEA, and ELCRA.  Because ELCRA claims are analyzed in the same manner and using the same standards as those brought

6

under Title VII, the ADEA, and § 1981, *see Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 n.4 (6th Cir. 2003) (Title VII); *Geiger v. Tower Auto.*, 579 F.3d 614, 626 (6th Cir. 2009) (ADEA); and *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) (§ 1981), the analysis of the Title VII, ADEA, and § 1981 claims applies equally to the ELCRA claims.

Zafar lacks direct evidence of discrimination, and therefore must establish his claim using circumstantial evidence through the burden-shifting framework known as the *McDonnell Douglas* test.  To make out a prima facie case of discrimination, the plaintiff must show "1) that he was a member of a protected class; 2) that he was discharged; 3) that he was qualified for the position held; and 4) that he was replaced by someone outside of the protected class."  *Geiger*, 579 F.3d at 622 (citing *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 394 (6th Cir. 2008)).  A plaintiff can also make out a prima facie case by showing, in addition to the first three elements, that a comparable, non-protected person was treated better.  *Jackson v. Int'l Fiber Corp.*, 395 F. App'x 275, 280 (6th Cir. 2010) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)).  If the plaintiff establishes a prima facie case, the employer must articulate a legitimate, nondiscriminatory reason for the discharge.  *Griffin v. Finkbeiner*, 689 F.3d 584, 592–93 (6th Cir. 2012).  Once the employer offers such reason, the burden of production returns to the plaintiff to show that the employer's proffered reason was pretext.  *Id.* at 593.  Pretext  can be established by showing that: (1) the employer's reason has no basis in fact; (2) the proffered reason did not actually motivate the employer's conduct; or (3) the proffered reason was insufficient to warrant the challenged conduct. *See Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).

### A.    Zafar Fails to Establish a Prima Facie Case

The Sixth Circuit has noted that "the plaintiff's burden at [this stage] is relatively light." *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 473 (6th Cir. 2002).  Nonetheless, the plaintiff must still

establish an inference that the employment decision was motivated by unlawful discrimination. "The salient issue in a Title VII claim of discrimination is whether the plaintiff was singled out because of her membership in a protected class, not whether she was treated less favorably than 'someone's general standard of equitable treatment.'"[2] *Corell v. CSX Transp., Inc.*, 378 F. App'x 496, 505 (6th Cir. 2010) (quoting *Batts v. NLT Corp.*, 844 F.2d 331, 337 (6th Cir. 1988)). There is no dispute that Zafar can establish the first two elements of a prima facie case of race, national origin, and age discrimination, because he is Indian and was approximately 54-years-old at the time he was discharged. Abbott argues, however, that Zafar's prima facie case fails on the third and fourth elements.

In order to establish the third element—that at he was qualified for the position— "a plaintiff must show that h[is] performance met h[is] employer's legitimate expectations at the time of h[is] discharge." *Vincent v. Brewer Co.*, 514 F.3d 489, 495 (6th Cir. 2007). Abbott contends that Zafar cannot make this showing because it is undisputed that his overall performance rating in 2013 was PA, or "Partially Achieved"—meaning that Zafar's performance was deficient and required improvement. Moreover, according to Denton, Zafar's performance in 2014 "was trending towards an overall 'Partially Achieved' rating due to what [she] viewed to be the same and continued performance deficiencies." (ECF No. 37-1 at PageID.140.)

---

[2]Zafar quotes extensively from *Brady v. Office of Sergeant at Arms of the U.S. House of Representatives*, 520 F.3d 490 (D.C. Cir. 2008), for the proposition that a district court need not concern itself with the prima facie case in deciding a summary judgment motion when the employer has advanced a legitimate, nondiscriminatory reason for the discharge. Rather, the case says, the court should only focus on whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin[.]" *Id.* at 494. However, the Sixth Circuit does not follow this rule and still examines the prima facie case in deciding summary judgment motions. *See Webb v. ServiceMaster BSC LLC*, 438 F. App'x 451, 453 (6th Cir. 2011). Moreover, the Fourth, Fifth, and Tenth Circuits have declined to adopt *Brady*'s approach of eschewing the prima facie case at the summary judgment stage, reasoning that the *McDonnell Douglas* framework remains the law governing summary judgment analysis. *See Pepper v. Precision Valve Corp.*, 526 F. App'x 335, 336 (4th Cir. 2013) (per curiam); *Atterberry v. City of Laurel*, 401 F. App'x 869, 871 n.1 (5th Cir. 2010); *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1202 n.12 (10th Cir. 2008).

Zafar does not directly address Abbott's argument. The cases he cites stand for the proposition that a court may not consider the employer's alleged legitimate nondiscriminatory reason as part of the prima facie case. *See, e.g. Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000). But that is not what Abbott argues. Rather, Abbott relies on Zafar's most recent performance evaluation and his performance leading up to his discharge to show that Zafar was not meeting Denton's and Abbott's legitimate expectations. In the context of his argument on pretext, Zafar points to his good reviews from previous years to show that his performance was not a legitimate basis for Abbott's decision to terminate him. However, such reviews do not show how Zafar was performing at the time he was discharged. In *Webb v. ServiceMaster BSC LLC*, 438 F. App'x 451 (6th Cir. 2011), the court said that the plaintiff could not rely on his performance reviews from prior years to show that he was qualified at the time of his discharge. The court observed that "this evidence is stale because Webb's performance or ServiceMaster's expectations may have legitimately changed since the prior review period." *Id.* at 453. The same is true in the instant case. Denton was Zafar's supervisor for the most recent reviews, which show that Zafar was not meeting Denton's or Abbott's expectations at the time he was terminated. Zafar thus fails to rebut Abbott's evidence that Zafar was not qualified.[3]

---

[3]Abbott also argues that Zafar cannot establish the Fourth element of a prima facie case because the employee who replaced Zafar obtained the position via a *bona fide* seniority system. Abbott argues that under such circumstances, i.e., where the replacement is chosen solely on the basis of seniority, no inference of discrimination arises. Although the argument is facially appealing, Abbott cites no case from the Sixth Circuit, or even a district court within the Sixth Circuit, to support the proposition. The sole case Abbott cites, *Mills v. Philadelphia Gas Works*, No. 06-2444, 2007 WL 2071881 (E.D. Pa. July 19, 2007), is an out-of-circuit district court decision not binding on this Court. Moreover, in *Bogle v. Orange County Board of County Commissioners*, 162 F.3d 653 (11th Cir. 1998), the Eleventh Circuit poked a hole in a similar argument, noting that "if the decision-maker knows that the replacement necessarily will be significantly younger (i.e. because every possible replacement happens to be younger) a discharged employee would still be able to make out a *prima facie* case." *Id.* at 657 n.3. Thus, a seniority system is not indisputable evidence of lack of discriminatory intent. In any event, the Court concludes that evidence that the employee who replaced Zafar was white and substantially younger than Zafar suffices to establish the fourth element of a prima facie case. *See Clack v. Rock-Tenn Co.*, No. 1:06-cv-119, 2007 WL 1983802, at *19 (E.D. Tenn. July 3, 2007) ("While the application of a *bona fide* seniority system is not unlawful under Title VII, as Plaintiff can show that he was replaced by someone outside the protected class, he can *arguably* establish the fourth element of his *prima facie* case." (citation omitted)).

### B.      Zafar Cannot Establish Pretext

Even if Zafar could establish a prima facie case, his claims fail because he does not show that Abbott's nondiscriminatory reason for terminating his employment—Zafar's drinking a can of Ensure from a case that was brought to the Analytical Laboratory for testing—is pretext.  Zafar argues that he has presented evidence of pretext through his own testimony that eight "mostly younger, and all white, employees," who were not engaged in flavor testing, drank cans of Ensure in the Analytical Laboratory and, yet, were not discharged.  (ECF No. 47 at PageID.636.)   Abbott argues that Zafar's testimony cannot support a finding of pretext because Zafar speculates about the employees' ages and whether or not they were flavor testing Ensure.  Regardless of whether Zafar's testimony is based on speculation or first-hand knowledge, it is irrelevant because there is no dispute that the decisionmakers—Denton, Darrington, and Frost—were unaware that any other chemist had been drinking Ensure in the laboratory outside of testing purposes.  (ECF No. 37-6 at PageID.402, 426; ECF No. 37-7 at PageID.440, 457; ECF No. 37-9 at PageID.483.)  Without knowledge of such conduct by other employees, Abbott could not have treated them better than Zafar.[4]  Zafar argues, however, that Abbott engaged in "willful blindness" by not inquiring of Zafar or other employees during its investigation whether they had seen or heard of employees drinking Ensure in the laboratory.  Zafar cites no case imposing a duty on employers in the context of an employment discrimination claim to conduct a flawless investigation, nor does Zafar cite any evidence showing that Denton, Darrington or Frost should have known that employees were drinking Ensure in the laboratory outside of legitimate testing purposes.  More importantly, even if the decisionmakers had been aware of such conduct, there is no evidence that any employee drank a can of Ensure from a

---

[4]Zafar's evidence regarding the eight employees who drank cans of Ensures undercuts Zafar's age discrimination claim because three of the employees, Bloom, James, and Clipfell are older than Zafar.  (ECF No. 37-13.) In addition, one employee, Shedd, is Hispanic, which undercuts Zafar's claim that Abbott discriminates in favor of whites.  (*Id.*)

case that was to be tested without knowing why the product was to be tested. Zafar's disregard for his own safety was, in fact, one of the main concerns for discharging Zafar. (ECF No. 37-7 at PageID.458.)

Zafar also argues that Abbott's shifting rationale for discharging him shows pretext. That is, Zafar argues that while Abbott claims that Zafar's performance was a secondary reason for the termination, Frost did not mention his performance in the termination script she prepared and Denton did not mention it to Zafar as a reason for termination. The evidence in the record refutes this argument. For example, the Recommendation for Termination Worksheet that Frost prepared specifically discusses Zafar's performance deficiencies. (ECF No. 37-10 at Page ID.496–97.) In addition, the termination script that Denton read informed Zafar that he was "not meeting the expectations of [his] position as an Analytical Chemist." (ECF No. 47-5 at PageID.656.) Thus, Abbott's reasons for terminating Zafar have remained consistent all along.

Zafar next argues that Abbott's failure to terminate Peter Carney, another chemist in the Analytical Laboratory, who admitted in his deposition in this proceeding that he drank Ensure in the laboratory for his own personal consumption, and observed others doing the same thing, is evidence of pretext. Zafar also notes that Abbott has not terminated any of the other employees Zafar identified in his deposition as having consumed product in the laboratory for their own personal consumption. Setting aside the fact that Zafar cites no evidence in support of these allegations, Zafar's argument ignores that he consumed Ensure under different circumstances than Carney or the other employees. Zafar was the only chemist to drink ensure in the laboratory without knowing why that product had been brought to the lab for testing—thereby endangering his safety and possibly that of consumers—and he did so before any of the testing had been completed. The fact that the particular case of Ensure turned out not to be from the batch of product believed to be

11

contaminated is irrelevant because Abbott's rationale for its termination decision still applied: Zafar exercised poor judgment in drinking a can of Ensure without knowing why it was to be tested.

Zafar also notes that after Abbott terminated him, it held a meeting to re-train its employees on the Dress Code and Personal Hygiene SOP to emphasize that Abbott strictly prohibits personal consumption of product in the Analytical Laboratory is somehow evidence that Abbott knew that younger, white employees had been consuming product in the lab. Contrary to Zafar's argument, this evidence does not show pretext but, instead, confirms that Abbott regards compliance with its rules an important issue.

Zafar next contends that Abbott's more favorable treatment of Carney and Mary Ann Alldredge, another laboratory employee, for their work infractions demonstrates disparate treatment in favor of younger, white employees. To be similarly-situated, "[t]he plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). "[R]ather, . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the *relevant* aspects.'" *Id.* (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994) (emphasis added)). Here, Zafar has not shown that Carney or Alldredge were similarly situated to him because they did not engage in conduct of "comparable seriousness." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006). Neither Carney nor Wright engaged in conduct that put their safety or Abbott's customers' safety at risk. Alldredge's violation of the Electronic Media Policy is not of comparable seriousness to Zafar's conduct. Similarly, Carney's issues—reading an e-book on a computer on company time, using the internet, and making a loud clicking noise that annoyed coworkers—also are not of comparable seriousness.

Zafar also points to an issue concerning recall of Similac infant formula that resulted from a bug infestation, and complains that Abbott "did not terminate the white managers or other employees" responsible for the infestation.  (ECF No. 47 at PageID.641.)  His argument lacks merit because he merely assumes that some unnamed "white managers" were involved.  The evidence shows, however, that no one was ever determined to be at fault.  (ECF No. 37-7 at PageID.443 ("It was no–no person's fault, to the best of my knowledge.").)

Finally, Zafar attempts to prove pretext by focusing on Darrington's hiring and firing practices.  As with his other arguments, this one also lacks merit.  Initially, Zafar's claim that he was the only Indian employed in the laboratory during the entire time that Darrington was the manager of the laboratory is wrong, as Zafar acknowledges in his brief that his first supervisor was Indian.  Moreover, that supervisor, Neyaz Hussein, was a supervisor when Darrington became the manager.  (ECF No. 37-6 at PageID.393–94.)  Zafar also claims, essentially, that Darrington hired only whites and never hired minorities.  He claims that Abbott's records show that it received applicants from numerous Indians for chemist positions at the Sturgis plant in 2014, but Darrington did not hire any of them.  However, Zafar offers no evidence showing whether the Indian applicants were qualified for the position or more qualified than the white applicants who received the job.  *See Hilbert v. Ohio Dep't of Rehab. & Corrs.*, 121 F. App'x 104, 110 (6th Cir. 2005) (noting that although appropriate statistical data can show that an employer discriminated against individual members of a protected class, such data must also "eliminate the most common nondiscriminatory explanations for the disparity" (internal quotation marks omitted)).  In addition, Darrington testified that all of those hires were "contract conversions"—meaning that they had already been hired by Abbott as contract employees and were simply being hired into permanent positions.  (ECF No. 37-6 at PageID.412–413.)  Moreover, Abbott has presented evidence that Darrington hired non-white and

13

older employees since assuming his manager position in 2001, including Asian and African-American individuals.[5]  (ECF No. 37-13.)  Morever, contrary to Zafar's assertion, the evidence shows that Darrington fired both whites as well as minorities.  (ECF No. 37-6 at PageID.397 (Darrington fired Donna Yoder, who is white, for insubordination); *Id.* at PageID.405 (Darrington fired John Eichorn and Dave Keiss, who were white, for falsifying documents).)  Accordingly, Zafar fails to create a genuine issue of material fact that Abbott's reasons for terminating his employment are pretext.

## IV.  CONCLUSION

For the foregoing reasons, the Court will grant Abbott's motion for summary judgment and dismiss Zafar's complaint with prejudice.


Dated:  May 27, 2016                                    /s/ Gordon J. Quist
                                                             GORDON J. QUIST
                                                  UNITED STATES DISTRICT JUDGE

---

[5]One employee, Emeilita Yoder, was approximately 40 years old when she was hired.  (ECF No. 37-13 at PageID.537.)